IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 5, 2018 Session

## STATE OF TENNESSEE v. ANITA H. LANE

**Appeal from the Circuit Court for Madison County
No. 16-470   Donald H. Allen, Judge**

_____

### No. W2017-01716-CCA-R3-CD

_____

The Appellant, Anita H. Lane, pled guilty to theft of property valued $60,000 or more but less than $250,000, a Class B felony, with the trial court to determine the length and manner of service of the sentence. After a sentencing hearing, the trial court sentenced her as a Range I, standard offender to eleven years in confinement and ordered that she pay restitution to the victim in the amount of $255,033.05. On appeal, the Appellant contends that the trial court erred by ordering that she pay $255,033.05 in restitution when she had no ability to pay that amount and that the trial court erred by finding that she had made no effort to pay restitution to the victim when she paid the victim's insurance carrier $100,000. The State concedes that the trial court erred by ordering restitution without making findings on the Appellant's ability to pay but argues that the trial court properly rejected her $100,000 payment to the insurance company as a basis for mitigation. Based upon the oral arguments, the record, and the parties' briefs, we agree that the trial court failed to make findings regarding the Appellant's ability to pay restitution. Therefore, we reverse the trial court's ordering that the Appellant pay $255,033.05 and remand the case for further proceedings consistent with this opinion. The judgment of the trial court is affirmed in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in
Part, Reversed in Part, and Case Remanded**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

C. Timothy Crocker, Michael A. Carter, and Ryan L. Hall, Milan, Tennessee, for the appellant, Anita H. Lane.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Jody S. Pickens, District Attorney General; and Shaun Alan Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Factual Background

In October 2016, the Madison County Grand Jury indicted the Appellant for theft of property valued $250,000 or more, a Class A felony. The indictment alleged that the theft occurred from The Markham Company "on or about 2007 through December of 2015."

On June 5, 2017, the Appellant pled guilty to theft of property valued $60,000 or more but less than $250,000, a Class B felony. A transcript of the Appellant's guilty plea hearing is not in the appellate record. However, the parties do not dispute that the Appellant was an employee of The Markham Company, which was owned by Charles Markham, and that she stole a significant amount of money over an extended period of time from the company.

Pursuant to the plea agreement, the trial court was to determine the length and manner of service of the sentence. At the Appellant's sentencing hearing, Tracy Utley, Charles Markham's daughter, testified that her father did not want to testify at the hearing and that she was speaking on his behalf. In August 2015, Utley learned from her father about the Appellant's theft and became involved in the investigation. Utley then read a victim impact statement into evidence in which she said the following: Charles Markham started The Markham Company, a construction company, in the early 1970s, and the Appellant worked for him for more than twenty years. The Appellant was responsible for the day-to-day operations of the company, including handling the payroll, making purchase orders, and interacting with vendors. The Appellant "made herself indispensable" to Mr. Markham, and her competence gave him a sense of security. Utley thought of the Appellant as "an older sibling," and the Appellant was considered to be part of the Markham family. At some point, Mr. Markham decided to retire early due to the lagging construction economy and "transition his attention to less stressful endeavors like the mini storage unit business, as well as opening a U-Haul franchise." Utley explained in her statement that her father "quite literally did this to keep [the Appellant] on the payroll. He was so committed to keeping [the Appellant] employed that he looked for ways to keep her around." In August 2015, Mr. Markham discovered that the Appellant had been stealing from his company.

Utley said in her statement that the amount of money taken from The Markham Company was "enough to bankrupt some businesses" and that the Appellant used the money to redecorate a second home and buy jewelry, clothes, manicures, and expensive handbags. After the theft was discovered, the Appellant told Utley that she was going to kill herself if Mr. Markham did not "call off" the investigation. When Utley told the Appellant that the investigation was "underway," the Appellant "ran away and in a

dramatic and superficial display of selfish theater, [the Appellant] then created more crisis for [Mr. Markham] when she took too many of a prescription medication in hopes this act would prove her desperation and failing faculties." Utley said that the Appellant "stole for spite" and that the theft was "a calculated, well thought-out plan that crescendoed" during the last days of Utley's mother's life. The Appellant took advantage of Mr. Markham's "distracted and vulnerable mental state" while he was attending to Utley's mother. Two months after Utley's mother died, Mr. Markham discovered the Appellant "had been lying to him for most of the time she had worked for him."

After reading her statement, Utley testified that the Appellant took more than $500,000 from The Markham Company. She said she was unaware of any restitution paid by the Appellant.

On cross-examination, Utley acknowledged that the Appellant attempted to commit suicide after the theft was discovered. She also acknowledged that prior to the Appellant's suicide attempt, the Appellant wrote a letter to Mr. Markham expressing "effectively guilt and sorrow for what she had done." Defense counsel asked Utley, "Do you have knowledge that Travelers Insurance was sent a cashier's check for $100,000 yesterday?" Utley answered, "No."

Ashley McCullar testified that she was an investigator with the Financial Crimes Unit of the Jackson Police Department and that she investigated this case. The investigation was conducted for almost one year before the grand jury indicted the Appellant. Investigator McCullar explained that the Appellant was "for lack of a better term, chief operating officer" for The Markham Company and that the Appellant "managed the day-to-day business of the company." Multiple businesses, including storage, U-Haul, and construction businesses, were within the company, and the Appellant was involved in all of them. Investigator McCullar's audit investigation showed that the Appellant took $300,000 from The Markham Company. However, Mr. Markham extended the audit investigation and found "a substantial amount more missing." At some point, Travelers Insurance paid Mr. Markham $255,000 for his loss.

Investigator McCullar testified that she tried to speak with the Appellant during the investigation. The Appellant scheduled an interview at the police department but never showed up for the interview. Police officers later found her "close to the river" and unresponsive, and she appeared to have taken some medication. Investigator McCullar went to the hospital to talk with the Appellant, but the Appellant was "in quite serious condition." Investigator McCullar could not speak with the Appellant at that time and later received a telephone call from the Appellant's attorney, requesting that the officer not speak with the Appellant without the attorney's being present. Investigator McCullar said that to her knowledge, the Appellant had not paid any restitution to The Markham Company. On cross-examination, Investigator McCullar testified that after the Appellant's suicide attempt, the Appellant remained hospitalized for "[q]uite some time."

Jason Anderson testified that he was a certified public accountant and certified fraud examiner and that he investigated the records for The Markham Company at the company's request. He examined the company's corporate records, bank statements, and transactions and examined how revenue flowed into the company and how expenses were paid. His investigation was more detailed than an annual audit. Very quickly in his investigation, Anderson noticed that $102,055 in cash had been moved out of the company's corporate bank accounts without documentation. He also found that "we had a series of transactions on credit cards that were unsupported by documentation." During Anderson's investigation, he identified the Appellant "as the possible perpetrator of the fraud." He asked that the Appellant give him the bank statements for the company, and she did so. However, the statements had been "manipulated." Anderson obtained the statements directly from the bank, and those statements differed from the statements provided by the Appellant.

Anderson testified that he found that $146,758.44 should have been collected by The Markham Company as rent but that the money had never been deposited into the company's bank account. Moreover, $22,069.96 was paid to credit cards unauthorized by Charles Markham. $28,938.40 was missing from the U-Haul rental business, an unauthorized payment of $2,529.49 was made to a Lowe's credit card, and transfers to PayPal "for the benefit of [the Appellant]" totaled $1,466.05. Anderson said that the total amount of money missing from the company was $303,817.34.

On cross-examination, Anderson testified that he audited The Markham Company three or four years "prior to this event" and that he did not find anything concerning at that time. He acknowledged, though, that the audit was "not really geared toward" finding fraud.

Upon being questioned by the trial court, Anderson testified that the total loss submitted to the district attorney's office was $309,322.40, slightly more than the amount he reported on direct examination. He said that at the time of the payment to Lowes, the Appellant was building a deck at her home and that the payment was "a little bit circumstantial."

Christine Markham, Charles Markham's wife, testified that she was familiar with the investigation involving the Appellant. Jason Anderson investigated the company's financial records for 2011 to 2015. After he completed his investigation, Mrs. Markham looked at the company's financial records "back to 2001, which was out of the scope of what he was looking at." Mrs. Markham was able to surmise from her investigation that the Appellant took an additional $150,000 or more from The Markham Company's storage business. The Appellant also forged Mr. Markham's signature on checks written to Verizon, Charter, Walmart, and other businesses, and the checks totaled $5,466.96. In December 2014, $2,200 was missing from a lock box in the office. The Appellant had

her own company credit card and charged $10,143.54 to that card. From 2001 to 2005, the Appellant wrote checks totaling $5,321.22, including a check to herself in the amount of $4,386. The Markham family and The Markham Company also incurred expenses due to the Appellant's theft. For example, due to stress, Mr. Markham had to have a heart catheter inserted, which cost him $2,639.22 out-of-pocket. The company had to buy new computers, change the locks, and upgrade security because the Appellant "had codes to everything." The expenses totaled $52,578.93.

Mrs. Markham testified that Travelers Insurance reimbursed The Markham Company $255,000 and that United Fire reimbursed the company $25,000. When Mrs. Markham subtracted the amount reimbursed, $280,000, from the total loss, $535,033.05 the Markham Company had still lost $255,033.05. Mrs. Markham said that she had empathy for the Appellant's family but that the Appellant needed to be held accountable for her actions. At the conclusion of Mrs. Markham's testimony, the State rested its case.

Shannon Godwin testified that she had a doctorate degree in educational leadership, that she was a professor at Bethel University, and that she had been friends with the Appellant for forty-one years. Dr. Godwin and the Appellant met their freshmen year of high school. She said the Appellant's family had been "pillars of the community at Trezevant and West Carroll Community Special School District for years." The Appellant volunteered at sporting events and was "just a precious, precious person." Dr. Godwin said that the Appellant had one daughter, that the Appellant's relationship with her daughter was "tight," and that the Appellant served as a mother figure to all of her daughter's friends. Dr. Godwin visited the Appellant after the Appellant's suicide attempt, but the Appellant did not remember Dr. Godwin or what had happened. Dr. Godwin said that she found the Appellant's crime "hard to believe" and that the crime had been "detrimental" to the Appellant and the Appellant's family. She said the Appellant would not commit the crime again.

Lana Suite testified that she had known the Appellant since high school and that she had three children about the same age as the Appellant's daughter. The Appellant's husband coached Mrs. Suite's children in basketball, and Mrs. Suite and the Appellant worked concession stands together. Mrs. Suite stated that the Appellant and the Appellant's husband were "great parents" and "great parent volunteers" and that "I cannot tell you the hundreds and hundreds of hours that they volunteered and put time into the basketball program." The Appellant and her husband fed children when the children did not have food and gave children clothing when the children did not have clothes. They also bought basketball shoes for children. Mrs. Suite said she could tell the Appellant had a great relationship with Charles Markham because Mr. Markham always donated to their largest annual fundraiser. The Lanes had a nice but modest home, and they did not drive fancy cars. Mrs. Suite said that the Appellant was "very, very close" to the Appellant's daughter and that the Appellant's daughter was an excellent student and very responsible.

Lex Suite, Lana Suite's husband, testified that the Appellant had been very active in the schools, particularly the basketball program, and that he was "shocked" by what he had heard about the Appellant during the sentencing hearing. Mr. Suite visited the Appellant in the hospital after her suicide attempt and had seen "a difference in the person she was before." He said that he did not think the Appellant would ever commit another crime and that she had "punished herself quite a bit."

Mike Lane, the Appellant's husband, testified that he was fifty-seven years old and that he worked for the Tennessee Department of Transportation for thirty-two years. He stated that to his knowledge, he had not seen any benefit from the money the Appellant took from The Markham Company. He and the Appellant owned their home, but it was mortgaged. The value of their home was "somewhere over 60,000," but they had a "70-something thousand dollar loan still pending on it." The Lanes had one daughter, who was employed by Murray State University. Mr. Lane described the Appellant as an "excellent" mother. She kept their house clean, prepared their meals, transported their daughter to activities, and "catered to our every need basically."

Mr. Lane testified that the Appellant and Charles Markham were "very, very close" and that they "genuinely cared about each other." Mr. Lane had no idea that the Appellant was stealing from The Markham Company. However, the day before the Appellant's suicide attempt, he noticed she was receiving "disturbing" telephone calls and made her tell him what was going on. At that time, the Appellant was not working for The Markham Company because she had quit to take care of her father, who had terminal cancer. Mr. Lane said that the Appellant's suicide attempt was "devastating" and that "[w]e're a shell of the family that we were."

Mr. Lane testified that since the Appellant's suicide attempt, she could no longer cook, was too apprehensive to drive, and had memory issues. Mr. Lane had to monitor her medications and remind her to eat. About two weeks before the sentencing hearing, Mr. Lane was diagnosed with acute cirrhosis. He stated that he was going to have to go to Nashville three times per week for treatment, that he could no longer work, and that the Appellant had to help him on a daily basis. He acknowledged that his condition was caused by excessive alcohol use and said that he no longer consumed alcohol. He and the Appellant used to attend First United Methodist Church, and the Appellant taught Sunday School. After her suicide attempt, though, they stopped going to church due to the "scaredness, and just not wanting to be seen." He stated that financially, they lived month-to-month and that they did not have enough money at the end of some months. Due to the Appellant's memory issues, Mr. Lane did not think she would ever have steady employment again. He said that the Appellant was remorseful, that her only crime prior to the theft was a speeding ticket, and that he was requesting alternative sentencing because he needed her to be with him.

The Appellant testified that she had lived in Trezevant her entire life, that she had two or three years of college, and that she was a bookkeeper. The Appellant married Mike Lane in 1983, and they had one daughter in 1991. At the time of the sentencing hearing, the Appellant's daughter was twenty-six years old, had a master's degree, and worked for Murray State University. The Appellant said that she used to be involved in the community and schools and that she loved to help people. She recalled helping two girls "that basically didn't have any moms or dads, didn't have anyone." The Appellant bought clothes for them and allowed one of them to move into her home.

Defense counsel asked the Appellant, "What do you remember about you actually doing the things that have been testified about today?" The Appellant answered, "I don't remember any of it." She said that she had looked at the evidence and that "I know I did it, but I can't explain why." The Appellant said that she loved Charles Markham like her own family and that he was still important to her. She said that she was not the same person she was before the theft, that she did not sleep at night, and that she could not function without her family and friends. After her suicide attempt, the Appellant had memory issues and had to write notes to herself in order to know if she had taken her medication or a shower. She explained that since her husband had become sick, "it is a real struggle because now we're having to both basically take care of ourselves." The Appellant said that she did not have any prior convictions and that she used to teach youth Sunday School at church. She stated that she was very sorry for any hurt she caused Mr. Markham and that she "looked at him like a father."

The Appellant testified that the day before her sentencing hearing, she obtained a release from liability from Travelers Insurance in exchange for her paying Travelers $100,000. She acknowledged that the payment was the result of "negotiations" between defense counsel and the insurance company. The Appellant obtained about $82,000 of the $100,000 by cashing-out her retirement and obtained the rest of the money from family. The Appellant said that she did not have any other money except "a little in our checking account . . . that we're living on" and that she did not have any source of income or property to sell. She stated that her husband's health was failing rapidly due to end-stage liver disease and that "[w]e can't make it without each other." She said that she was "begging this court for mercy" and that she would abide by any conditions imposed by the court if granted alternative sentencing.

Madison Lane, the Appellant's daughter, testified that she emptied her savings account of $3,000 in order to help the Appellant raise $100,000 to pay Travelers. Miss Lane's grandmother contributed $14,500. Miss Lane said that she was thankful for the way her parents raised her and that her being an only child financially allowed them to help other children. She said that as soon as she left for college, her parents allowed another girl to use her bedroom. Miss Lane's parents "volunteered every moment that they had." They worked with the basketball program and "were there every time the

doors were open." Miss Lane's family did not go on vacations. Instead, they went to basketball camp every year.

Miss Lane testified that she had never known a time when Charles Markham was not in her life. He sponsored her pee-wee basketball team and was a grandfather figure to her because he truly cared for her family. Miss Lane acknowledged that the Appellant "did some bad." She said that since her father's recent diagnosis, she had had been looking after both of her parents because the Appellant could not remember to take her medications and because her father "has to have everything that's . . . input into his body regimented." She said she was doing everything she could to help her parents while maintaining her employment. Miss Lane stated that the Appellant would not commit another crime and that the Appellant attempted suicide because the Appellant was trying to relieve her daughter, her husband, and the Markhams of any pain she caused.

The State introduced the Appellant's presentence report into evidence. According to the report, the then fifty-four-year-old Appellant graduated from Trezevant High School and attended Bethel College from August 1980 to 1983. In the report, the Appellant stated that she first consumed alcohol in 1980 and that she last consumed alcohol in 2015. She said that her alcohol use "led to an affair" and that she stopped using alcohol after her suicide attempt. The Appellant stated that she did not use illegal or nonprescribed drugs but that she used the following prescribed medications: Belsomra, alprazolam, rosuvastatin, ranitidine, topiramate, sertraline HCL, meloxicam, and rizatriptan. The Appellant said in the report that she had "great" family support, including her husband, daughter, and a sister who checked on her numerous times daily. The report showed that the Appellant worked for The Markham Company from 1992 to 2015 but showed no other employment. The Appellant stated in the report that she owned a home valued at $60,500, a 2011 Jeep valued at $11,300, a 2000 Jeep valued at $3,000, and a 2004 Nissan valued at $2,081. The Appellant reported that she owed $78,794.71 on her home and that that her monthly mortgage payment was $934.57. The report confirmed that the Appellant had one speeding ticket in 2008.

A spreadsheet attached to the presentence report showed that from 2001 to 2015, the Appellant took $482,454.12 from The Markham Company and that the Markham family and the company incurred $52,578.93 in expenses due to the theft for a total loss of $535,033.05. Insurance companies reimbursed The Markham Company $280,000, resulting in an outstanding loss of $255,033.05.

At the conclusion of the hearing, the trial court applied enhancement factor (1), that the defendant "has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," based on Appellant's speeding ticket but gave the factor "very, very slight weight." Tenn. Code Ann. § 40-35-114(1). The trial court also applied enhancement factor (6), that the amount of property taken by the victim was particularly great, because the Appellant pled guilty to theft of

property valued $60,000 or more but less than $250,000, but the proof showed she took more than $300,000. See Tenn. Code Ann. § 40-35-114(6). The court gave the factor great weight. Finally, the trial court applied enhancement factor (14), that the defendant abused a position of private trust, and also gave the factor great weight. See Tenn. Code Ann. § 40-35-114(14). [1]

In mitigation, the trial court gave moderate weight to the fact that the Appellant did not have a significant criminal history and slight weight to the fact that she pled guilty and accepted responsibility for her crime. See Tenn. Code Ann. § 40-35-113(13). The court refused to consider the Appellant's $100,000 payment to Travelers as a basis for mitigation. The trial court rejected the Appellant's request for alternative sentencing and ordered that she serve eleven years in confinement. The court also ordered that she pay $255,033.05 in restitution to the victim.

## II.  Analysis

### A.  Amount of Restitution

The Appellant challenges the trial court's ordering that she pay $255,033.05 in restitution when she did not have the ability to pay it. The State concedes that the trial court erred.

A trial court may order restitution as part of a prison sentence pursuant to Tennessee Code Annotated section 40-35-104(c)(2). The amount must be based on the victim's pecuniary loss. See Tenn. Code Ann. § 40-35-304(b). "Pecuniary loss" consists of special damages and out-of-pocket expenses incurred by the victim relative to investigation and prosecution of the crime. Tenn. Code Ann. § 40-35-304(e). All restitution orders must be determined via the procedure in Tennessee Code Annotated section 40-35-304. See Tenn. Code Ann. § 40-35-304(g). The procedure requires, among other things, that the court "specify at the time of the sentencing hearing the amount and time of payment . . . and may permit payment or performance in installments." Tenn. Code Ann. § 40-35-304(c). The procedure also requires that the court "consider the financial resources and future ability of the defendant to pay or perform." Tenn. Code Ann. § 40-35-304(d). If the payment period expires and the

---

[1] Although not raised by the Appellant, this court has stated that "we are reluctant to find that a single speeding ticket constitutes criminal behavior so as to permit enhancement of the sentence." State v. Brenda F. Jones, No. W2002-00751-CCA-R3-CD, 2003 WL 21756681, at *4 (Tenn. Crim. App. at Jackson, July 29, 2003). However, given that the trial court gave enhancement factor (1) "very, very slight weight" and gave enhancement factors (6) and (14) "great weight," the error was harmless. See Tenn. R. App. P. 36(b); State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012) (stating that "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed . . . . So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld").

defendant has failed to pay restitution as ordered, any unpaid portion may be converted to a civil judgment. Tenn. Code Ann. § 40-35-304(h)(1).

Here, the trial court heard evidence, found facts concerning the amount taken from the victim, and ordered that the Appellant pay $255,033.05 in restitution. However, the court did not consider Appellant's ability to pay that amount. The court also did not set a time for payment or say whether the Appellant could pay in installments. Thus, the case must be remanded for further proceedings.

### B. Appellant's Payment to Travelers Insurance

The Appellant contends that the trial court erred by finding that she had made no effort to pay restitution to the victim when she paid the victim's insurance carrier $100,000. The State argues that the trial court properly rejected the Appellant's $100,000 payment to the insurance company as a basis for mitigation. We agree with the State.

Before the Appellant's sentencing hearing, she filed a "Statement of Mitigating Factors" in which she asserted that the trial court should consider the following: (1) that the offense did not threaten or cause serious bodily injury; (2) that she had no significant criminal history; (3) that she had shown remorse; (4) that she attempted suicide; (5) that she suffered severe memory loss as a result of her suicide attempt; (6) that her husband suffered from severe medical issues and would need treatment at Vanderbilt Hospital; and (7) that she had contributed toward restitution by cashing-out her retirement savings in the amount of $82,000. At the sentencing hearing, defense counsel contended that the Appellant had "made as strong an effort at restitution as she can. She cashed out all of her retirement. Her daughter emptied her account and her mother helped her." However, the trial court refused to mitigate the Appellant's sentence based upon her $100,000 payment to Travelers, explaining:

> The victim is Mr. Markham and The Markham Company. And, again, the Travelers Insurance Company, they're not the victim, you know. They're not the victim. Even though she may have paid a large sum of money to settle a claim that the insurance company had against her, she certainly hasn't spent money to try to reimburse or try to pay restitution to the victim. So, again, I don't find that to [be] an enhancement factor. Or, excuse me, as a mitigating factor.

This court reviews the length, range, or manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of

- 10 -

sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Appellant in her own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the Appellant to demonstrate the impropriety of her sentence. See Tenn. Code Ann. § 40-35-401, Sentenc'g Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

The Appellant contends that the trial court erred by refusing to consider her $100,000 payment to Travelers as a mitigating factor because she "withdrew the entirety of her retirement funds and had no other means to make restitution." She argues that even if she had given the money to The Markham Company, Travelers would have obtained the money from The Markham Company by exercising its right of subrogation.

This court has held that a defendant's effort to make restitution to the victim after detection of the crime is an appropriate mitigating factor under the "catchall" provision of Tennessee Code Annotated section 40-35-113(13). State v. Mary McNabb, No. 03C01-9404-CR-00135, 1995 WL 48459, at *2 (Tenn. Crim. App. at Knoxville, Feb. 8, 1995). In this case, though, the trial court rejected the Appellant's claim that her payment to Travelers should be considered restitution to the victim and, hence, a mitigating factor. The trial court explained it's reasoning, stating that Traveler's was not the "victim" in this case and that the Appellant made the $100,000 payment in order to settle a claim that Travelers had against her. We agree with the trial court. The Appellant's payment to Travelers was the result of negotiations with the insurance company after the Appellant's guilty plea and was self-serving in that the Appellant paid Travelers in exchange for a release discharging her from further liability to Travelers. Nothing indicates that but for Travelers agreeing to the release, the Appellant would have paid Travelers, or the victim for that matter, anything. Finally, the Appellant's assertion that Travelers would have sought reimbursement from the victim if she had paid the money to the victim is pure speculation. Accordingly, we conclude that the trial court did not abuse its discretion by rejecting the Appellant's proposed mitigating factor and that her eleven-year sentence is not excessive.

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, the trial court's ordering that the Appellant pay $255,033.05 in restitution is reversed, and the case is remanded to the trial court to determine the Appellant's ability to pay restitution, the amount of restitution, and the time for payment. The judgment of the trial court is affirmed in all other respects.

_____
NORMA MCGEE OGLE, JUDGE